# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **LEVI SETH NIMETY,** | ) | Civil Action No. 7:16cv00043 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **FRED SCHILLING,** *et al.*, | ) | By: Norman K. Moon |
| Defendants. | ) | United States District Judge |

Levi Seth Nimety, a Virginia inmate proceeding *pro se*, filed a complaint pursuant to 42 U.S.C. § 1983 naming numerous administrative and medical staff of the Virginia Department of Corrections ("VDOC") and Keen Mountain Correctional Center ("KMCC") as defendants. Nimety's claims involve medical treatment by four doctors and a mental health practitioner, and numerous staff's review of various administrative forms. Defendants Crowder, Kiser[1], Lester, Owens, Schilling[2], Webb, and Widener (collectively, "correctional defendants") filed a motion to dismiss. Defendants Dr. Edsen, Dr. Lard, and Dr. Osemobor (collectively, "doctor defendants") and defendant Dr. Phillips also filed motions to dismiss. Defendants Nurse Bucklen and Nurse Whited (collectively, "nurse defendants") filed a motion for summary judgment.[3] Nimety responded to each motion, and the matter is ripe for disposition.[4] Upon consideration of this action, I will grant defendants' motions.

---

[1] Nimety refers to Kiser as "Kaiser" in the complaint.

[2] Nimety refers to Schilling as "John Doe Health Services Director" in the complaint.

[3] The motion was filed as a "motion to dismiss or motion for summary judgment," but because I consider the exhibits attached to the motion, I convert it to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). Nimety received explicit notice that I may do so and had the opportunity to respond. (ECF No. 55.)

[4] Although Nimety filed an affidavit in support of the complaint in response to the motions to dismiss, he did not file evidence to oppose the nurse defendants' motion for summary judgment.

# I.

Nimety began experiencing pains and poor circulation in his legs, ankles, and feet while incarcerated at a regional jail in 2012. Nimety was diagnosed with Restless Leg Syndrome and was prescribed, *inter alia*, 600 milligrams of ibuprofen. Nimety did not believe the prescription was effective.

Nimety was transferred to two VDOC facilities in early 2013. Nimety told the medical staff at each facility that the ibuprofen was ineffective and that he disagreed with the Restless Leg Syndrome diagnosis. A facility doctor discontinued the ibuprofen and ordered an ankle-brachial index test to diagnose the bilateral foot pain. The test results were within normal limits. Nimety injured his left shoulder while lifting weights in June 2013 just before being transferred away from the prison.

## A.

Dr. Phillips' and the doctor defendants' involvement with Nimety began after Nimety was transferred to KMCC on August 14, 2013, while Nimety still experienced pains in his lower extremities and left shoulder. On September 10, 2013, Nimety had an appointment with defendant Dr. Phillips about leg and ankle pains. Dr. Phillips diagnosed Nimety with plantar fasciitis, ordered X rays of his feet, gave him exercises to complete, and instructed him to buy ibuprofen from the commissary. The X-ray results were unremarkable, noting normal joint spaces and no fracture.

On January 2, 2014, Nimety went to the medical department and received 200 milligrams of ibuprofen, twice daily, for five days. A nurse told him to notify medical staff if the symptoms did not improve or worsened.

2

On March 4, 2014, Nimety met with Dr. Phillips, explaining his "severe and persistent" leg pain despite complying with all her prior instructions. Dr. Phillips diagnosed him with Peroneal Tendonitis, ordered various tests, and prescribed ibuprofen, ostensibly, at 500 mg for one month. The test results were within normal limits. Nimety did not return to Dr. Phillips about lower extremity pains by the time he left KMCC around February 2015. However, he did see Dr. Phillips for his left shoulder.

On November 18, 2014, Nimety met with Dr. Phillips for left shoulder pain. Dr. Phillips diagnosed Nimety with a shoulder strain, ordered X-rays, told him to obtain pain medication from the commissary, and gave him a rehabilitatory exercise handout. The X-ray report said, "No acute bony lesions are seen. Faint calcific density of the supraspinatus tendon suggestive of tendonitis is noted. Mild arthritis of the AC joint is noted." The radiologist's impression was "mild degree of supraspinatus calcific tendonitis and mild arthritic change of the Acromioclavicular joint are noted."

On January 13, 2015, Nimety met with Dr. Phillips for left shoulder pain, explaining that he could not complete the exercises because he did not have the proper exercise equipment. Dr. Phillips told Nimety that prison security staff would not approve the equipment and that he could complete the exercises with a sock and a weighted pile instead. Dr. Phillips diagnosed Nimety with "chronic tendonitis / shoulder pain" and ordered a cortisone injection. Nimety received the injection a week later and found it to be ineffective. This appointment was Dr. Phillips' last contact with Nimety.

On February 12, 2015, Nimety met with defendant Dr. Edsen about leg and foot pains. Nimety explained his symptoms, the past tests and treatments, and his belief that it was a

3

vascular problem. Dr. Edsen disagreed, thinking it was a neuropathological problem, and ordered "HIV, Vit B12, Folate, TSH, [and] EMG/NCS" tests.

On March 12, 2015, Nimety met with Dr. Edsen about left shoulder pain. Nimety explained that the cortisone shot was ineffective and that he was unable to do the exercises prescribed by Dr. Phillips without resistance bands and a five-pound weight bar. Dr. Edsen prescribed 600 milligrams of ibuprofen, and two new rehabilitatory exercise handouts – one for an Acromioclavicular joint injury and one for a "regular" shoulder. Dr. Edsen denied Nimety's requests for an MRI and for a specialist consultation.

The EMG and NCS tests were done on March 24, 2015, and the results were within normal limits. The HIV, Vit B12, Folate, and TSH tests were not done.

On May 12, 2015, Nimety met with Dr. Edsen for left shoulder and leg pains. Nimety told her that 600 milligrams of ibuprofen was ineffective and that he could not complete the newer exercises because he still did not have the proper equipment.[5] Dr. Edsen denied his requests for an MRI, a specialist consultation, and a bottom bunk assignment, but Dr. Edsen increased the ibuprofen to 800 milligrams and approved his request for a second ankle-brachial index test. This test showed results within normal limits. This appointment was Dr. Edsen's last contact with Nimety.

On September 15, 2015, Nimety met with Dr. Lard for shoulder, leg, and foot pains. Nimety explained the prior tests and treatments and his symptoms. Dr. Lard prescribed 500 milligrams of Naproxen and gave Nimety the same handout for rehabilitatory exercises he allegedly could not do because he did not have the proper equipment. Dr. Lard denied Nimety's

---

[5] Nimety acknowledged in an informal complaint, which was filed in support of summary judgment, that Dr. Edsen had told him to stop the exercise regimen during this appointment.

4

requests for an MRI, a specialist consultation, and a bottom bunk assignment. Nimety alleges that Dr. Lard refused to address the leg pain. This appointment was Dr. Lard's first and last contact with Nimety.

On January 28, 2016, Nimety met with Dr. Osemobor about injuries to his right shoulder and neck. Nimety explained that he had fallen while climbing a bunk five days earlier. Dr. Osemobor ordered X-rays, did not order medication, and denied Nimety's request for a bottom bunk assignment. Nimety does not describe any further involvement by Dr. Osemobor.[6]

**B.**

On December 8, 2013, Nimety met with a mental health staffer about anxiety caused by his leg, foot, and shoulder pains. The staffer gave Nimety a self-help handout, which Nimety deemed ineffective.

On July 24, 2015, Nimety sent a request to see a staff psychologist. Defendant Lester replied, "Please be more specific as to why you need to be seen by mental health." Nimety renewed his request on August 4, 2015, explaining he needed an appointment about anxiety. On August 19, 2015, Nimety met with Lester and explained he was suffering from depression and anxiety because of his leg and shoulder pains. Lester offered Nimety the self-help relaxation handout that Nimety had received in 2013 but deemed ineffective. Lester consequently told Nimety to sign up for sick call.[7]

---

[6] The exhibits in support of the nurse defendants' motion for summary judgment reveal that Nimety was issued a thirty-day bottom bunk pass on February 18, 2016, and that he refused that accommodation on February 23, 2016.

[7] A sick call is "care for ambulatory offenders with health care requests which are evaluated and treated in a clinic setting; it is the system through which each offender reports for and receives appropriate health services for a non-emergency illness or injury, in a timely manner in consideration of medical urgency." If an inmate's informal complaint or other request

5

## C.

Nimety filed an informal complaint on November 30, 2014, about how he could not complete the exercises recommended by Dr. Phillips because he did not have the proper equipment. Nurse Bucklen responded, "At this time, you do not have an order for special equipment. Please utilize sick call procedures as needed." Nimety filed a related regular grievance, and defendant Grievance Coordinator Webb rejected it at intake, telling him to follow Nurse Bucklen's instructions to sign up for sick call.[8]

On September 1, 2015, Nimety filed an informal complaint, alleging that his depression and anxiety were not being treated. Defendant Widener, who was the Mental Health Supervisor, responded, "(1) You were encouraged to sign up for sick call due to your complaints being medical related (leg pain). (2) You were offered self help relaxation techniques to assist with your reported anxiety and depression symptoms. You declined to receive those." Nimety filed a related regular grievance, and defendant Captain Owens rejected it for being a request for services, noting, "You were evaluated by [Qualified Mental Health Practitioner]." Nimety appealed, and defendant Crowder upheld Captain Owens' decision.

Nimety filed three informal complaints in September 2015 about the doctors not approving his requests for an MRI and a specialist consultation and also about Dr. Lard not addressing Nimety's complaints of leg pain and not approving a bottom bunk assignment. Nurse Bucklen responded, "[Y]ou have not been ordered an MRI or referral to a specialist," "Upon

---

is outside what the nursing staff can provide or beyond what the physician has ordered, an inmate may request a sick call to discuss that request with the doctor. The sick call process is explained to inmates during orientation and in the Offender Handbook.

[8] Webb's intake decision was upheld on appeal.

6

evaluation by the doctor, you do not meet criteria for a bottom bunk," and "Utilize sick call if symptoms persist or worsen." Nimety filed related regular grievances in October 2015. Defendant Warden Kiser deemed the grievances unfounded, noting that the facility doctor had not ordered the requests. Defendant Schilling, who was the VDOC Health Services Director, affirmed Warden Kiser's responses, noting that the facility doctor determines appropriate treatments.

On September 27, 2015, Nimety filed an informal complaint that he had not yet received the Naproxen prescribed on September 15. On September 29, 2015, Nimety filed an emergency grievance for the same reason. Nimety does not elaborate on the disposition of these two requests.

Nimety filed an informal complaint on October 6, 2015, alleging that the Naproxen was ineffective. Nurse Bucklen responded, "Sick call M-F by IRF AM Chow Orange Box."[9]

Nimety filed an informal complaint in October 2015 about the HIV, Vit B12, Folate, and TSH tests that were ordered but not yet done. Defendant Whited responded, "I will check! You will be called over if [the doctor] still wants labs." After he was not called to the medical department, Nimety filed a regular grievance about the omitted tests. Webb rejected it at intake, telling him to attach a document showing the tests had been ordered. Crowder upheld Webb's intake decision on appeal.

Webb rejected several of Nimety's other grievances at intake that Crowder also upheld when appealed. Nimety filed a grievance about waiting two weeks to receive the Naproxen

---

[9] Nurse Bucklen avers that this shorthand means "an IRF (informal request form) to see medical staff may be made any day Monday – Friday and that the form should be left in the Orange Medical Box at A.M. Chow (breakfast)." She further explains that an inmate is seen during the same day if an informal request form is left in the orange medical box at breakfast.

7

ordered by Dr. Lard, and Webb rejected it for "insufficient information. Attach documentation when funds were deducted from your account, the emergency grievance, and when did you receive meds?" Nimety resubmitted the grievance, noting he had supplied the requested documentation with the first grievance. Webb rejected it again, noting it did "not affect[] [Nimety] personally," and Crowder upheld that decision. Also, Nimety filed a grievance about "ineffective medicine," Webb rejected it as a "request for service," and Crowder upheld the decision.

As a consequence of Webb's and Crowder's intake decisions, Nimety filed informal complaints in November 2015 alleging that Webb and Crowder were maliciously denying his grievances. Webb responded to each, noting that an inmate may appeal an intake decision to the regional ombudsman for review. Nimety filed related regular grievances that Webb rejected at intake as non-grievable and referred him to his prior informal complaints. Crowder upheld the intake decisions on appeal.

In December 2015, Nimety filed an informal complaint about policy restricting his access to MRIs and specialists. Webb responded, "DOC policy is not made at KMCC. Policy issues or concerns can be addressed with Richmond (Policy and Initiative Unit)." Nimety filed a related regular grievance that Webb rejected at intake as "non-grievable: Level II is last level of appeal." Crowder upheld the decision on appeal.

On February 2, 2016, Nimety filed an informal complaint about Dr. Osemobor not treating pain resulting from his fall from his bunk and for not ordering a bottom bunk assignment. Nimety commenced this action immediately thereafter.[10]

---

[10] No subsequent facts are alleged about this informal complaint, likely because no one had

8

## II.

The correctional defendants, the doctor defendants, and Dr. Phillips each filed a motion to dismiss. When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must accept as true all well-pleaded allegations. *See Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Stated differently, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Nimety alleges that Dr. Phillips, Lester, and the doctor defendants were deliberately indifferent to his pains and that Webb, Crowder, Widener, Captain Owens, Warden Kiser, and Director Schilling interfered with access to medical care by disapproving his various administrative requests. I will grant these defendants' motions to dismiss because the complaint fails to state a deliberate indifference claim against them.

---

yet responded before he commenced this action. He filed the informal complaint on February 2, 2016, and the complaint's envelope bears a prison stamp dated February 4, 2016. The complaint arrived at the court on February 9, 2016.

## A.

Deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment and is actionable under § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks omitted).

An official is "deliberately indifferent" only if he was personally aware of facts indicating a "excessive risk to an inmate's health or safety," actually recognized the existence of such risk, and disregarded or responded unreasonably to that risk. *Farmer*, 511 U.S. at 837. "To establish that a health care provider's actions constitute deliberate indifference . . . , the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

To establish that a non-medical prison official's act or omission constitutes deliberate indifference, a plaintiff must show that the official was personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or was deliberately indifferent to the medical provider's misconduct when even a lay person would understand that the medical provider is being deliberately indifferent. *Id.* at 854. Supervisory prison officials are entitled to rely on the professional judgment of trained medical personnel. *Id.* Supervisory liability is not established merely by showing that a subordinate was deliberately indifferent to an inmate's medical need. *Id.*

**B.**

It is clear from Nimety's own account that he was offered appropriate treatment from Dr. Phillips, the doctor defendants, and Lester. Lester offered self-help relaxation techniques as treatment, but Nimety refused because he did not think the techniques helped him two years earlier. Confronted with Nimety's refusal to perform Lester's recommended course of treatment, Lester advised Nimety to sign up for sick call to discuss alternatives with the facility doctor. Furthermore, Drs. Phillips, Edsen, and Osemobor ordered multiple diagnostic tests, and Drs. Phillips and Edsen gave Plaintff self-help exercise guides for his left shoulder. Nimety merely disagrees with the available methods, and he does not allege that he did not have a sock or items of sufficient weight, as recommended by Dr. Phillips, to complete the exercises nonetheless.[11] The deliberate indifference standard "is not satisfied by . . . mere disagreement concerning '[q]uestions of medical judgment.'" *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (citing *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975)). The allegations that doctors would not approve Nimety's request for an MRI based on cost does not, even assuming their truth, describe deliberate indifference when those same doctors did order less expensive diagnostic tests and did diagnose Nimety's maladies even when faced with a patient who admittedly did not perform the medically-necessary rehabilitatory exercises.

The facility doctors repeatedly and continually treated Nimety's complaints of various pains. Dr. Phillips had prescribed ibuprofen, and when Nimety said it was not effective, she increased its dosage and also ordered a cortisone injection. Dr. Edsen twice increased the

---

[11] The medical record reflects that Dr. Edsen explained to Nimety that an MRI is not indicated since he has done less than full course of the rehabilitatory exercises and did not follow the prescription regime.

11

dosages of ibuprofen when Nimety complained that the prior dosages of ibuprofen were not effective.[12] In response to Nimety's complaints of pains, Dr. Lard changed pain medications, prescribing Naproxen instead of ibuprofen. Nimety does not allege that he had complained of pain to Dr. Osemobor, had requested pain medications from Dr. Osemobor, or otherwise experienced sufficient pain to implicate Eighth Amendment protections. Nimety also does not allege that the Naproxen already prescribed by Dr. Lard had been discontinued before he saw Dr. Osemobor or that he was not already receiving pain medications for his prior complaints. "There is no Eighth Amendment requirement that prison doctors keep an inmate pain-free in the aftermath of proper medical treatment." *Chamberlain v. Clarke*, No. 7:13cv266, 2014 U.S. Dist. LEXIS 26863, at *8, 2014 WL 2154183, at *2 (W.D. Va. May 22, 2014) (Wilson, J.) (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain. To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd.")). Even assuming the truth of the allegation, Nimety does not describe how the "pain" resulting from a fall five days earlier objectively constitutes a sufficiently serious injury. *See, e.g.*, *Farmer*, 511 U.S. at 834.

Even if the HIV, Vit B12, Folate, TSH, or EMG/NCS tests' delay or omission is attributable to the doctor defendants, Nimety does not describe any resultant substantial harm or serious risk of harm. *See, e.g.*, *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir 2008). "[A]n inadvertent failure to provide adequate medical care" does not amount to the deliberate

---

[12] The medical record also reflects that Nimety admitted on May 12, 2015, that the ibuprofen worked well on less severe days.

12

indifference. *Estelle*, 429 U.S. at 105-06. Accordingly, Dr. Phillips', the doctor defendants', and Lester's motions to dismiss will be granted.

## C.

The correctional defendants' motion to dismiss will also be granted as to the claims against Webb, Crowder, Widener, Captain Owens, Warden Kiser, and Director Schilling. Nimety does not have a constitutional right to participate in grievance proceedings. *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994). Furthermore, none of these defendants' responses to requests for services, informal complaints, regular grievances, or grievance appeals demonstrates their personal involvement with a denial of treatment, deliberate interference with treatment, or either the tacit authorization or deliberate indifference to a medical provider's misconduct when even a lay person would understand that the medical provider is being deliberately indifferent. *See, e.g.*, *Miltier*, 896 F.2d at 854; *see also Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (discussing liability for a supervisor's deliberate indifference). Moreover, a prison official's "after-the-fact denial of a grievance falls far short of establishing § 1983 liability." *DePaola v. Ray*, No. 7:12cv00139, 2013 U.S. Dist. LEXIS 117182, at *23, 2013 WL 4451236, at *8 (W.D. Va. July 22, 2013) (Sargent, M.J.) (citing *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006)). Nimety's reliance on *respondeat superior*, buzzwords, labels, and conclusions are not sufficient to state a claim actionable via § 1983. *Twombly*, 550 U.S. at 555; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 n.7 (1978). Accordingly, the correctional defendants' motion to dismiss will be granted as to the claims against Webb, Crowder, Widener, Captain Owens, Warden Kiser, and Director Schilling.

13

**III.**

The nurse defendants filed a motion for summary judgment asserting the defense of qualified immunity.[13] Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If, however, the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Notably, a plaintiff may not amend a complaint

---

[13] The affirmative defense of qualified immunity requires a court to make two determinations: (1) taking the facts in a light most favorable to a plaintiff, did a defendant violate a constitutional right, and (2) whether the contours of that right was clearly established to a reasonable official in a defendant's position. *Pike v. Osborne*, 301 F.3d 182, 184 (4th Cir. 2002); *see In re Allen*, 106 F.3d 582, 593 (4th Cir. 1997) ("[A]n official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority.").

14

through argument in a brief opposing summary judgment. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

Nurse Whited is the KMCC Head Nurse and supervises Nurse Bucklen for administrative purposes. Nurse Bucklen, as the KMCC Nursing Supervisor, supervises nursing staff, reviews charts, and responds to most of the inmate informal complaints and grievances regarding medical care. However, all KMCC nurses act at the direction of the facility doctor for clinical purposes involving patient care. Thus, the nurse defendants do not have the authority to order any medication, test, treatment, exercise, prosthetic, mobility aid, equipment, or outside referral. The nurse defendants also do not have any role in making VDOC policies.

The record does not establish any genuine dispute of material fact regarding the nurse defendants, and they are entitled to qualified immunity and summary judgment. The record does not reflect that the nurse defendants personally denied any medical consultation, equipment, or treatment ordered by a physician related to this action. It also does not reflect that they deliberately interfered with a doctor's treatment or tacitly authorized or were deliberately indifferent to a medical provider's misconduct when even a lay person would understand that the medical provider is being deliberately indifferent.

Nurse Bucklen repeatedly advised Nimety to submit a sick call request if his symptoms persisted or worsened. Even if the HIV, Vit B12, Folate, TSH, or EMG/NCS tests' delay or omission is attributable to the nurse defendants, Nimety does not describe any resultant substantial harm or serious risk of harm. *See, e.g.*, *Webb*, 281 F. App'x at 166. "[A]n inadvertent failure to provide adequate medical care" does not amount to the deliberate indifference. *Estelle*, 429 U.S. at 105-06. Furthermore, the "EMG" and "NCS" tests were

15

completed, and Whited avers that the HIV, Vit B12, Folate, and TSH tests would not be related to his complaints about shoulder, leg, ankle, or foot pains.  Moreover, Nimety fails to describe the nurse defendants', or any defendant's, knowledge of or involvement with the Naproxen being delayed in September 2015.  Accordingly, the nurse defendants are entitled to qualified immunity and summary judgment.

## IV.

For the reasons stated, I will grant the defendants' motions to dismiss and for summary judgment.

**ENTER**: This  10th day of March, 2017.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

16